## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| KARL LUSCHENAT, et al., | |
|     Plaintiffs, | |
|     v. | No. 3:10-cv-1038 (SRU) |
| CITY OF NEW HAVEN, et al., | |
|     Defendants. | |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This memorandum of decision decides cross-motions for summary judgment that principally raise the question whether New Haven must use old civil service test results to fill new jobs. Under local municipal rules, the City must use a promotion exam's results to fill civil service vacancies for one to two years after the City approves and publishes scores.  In *Ricci v. DeStefano*, a group of white firefighters challenged New Haven's decision to discard the results of a 2003 promotion exam. *See Ricci v. DeStefano*, 554 F. Supp. 2d 142 (D. Conn. 2006), *aff'd*, 530 F.3d 87, *rev'd and vacated*, 557 U.S. 557 (2009).  The *Ricci* plaintiffs prevailed, but because of the years of disputes and appeals in *Ricci*, the City only announced the results of the 2003 test in 2009. Plaintiffs in this case claim that, because the City only finalized a list of passing scores in 2009, the City must use that list to fill any vacancies available at the time the City announced the results and for two years thereafter.  They ask this court to issue a writ of mandamus compelling the City to comply with the letter of the City's civil service rules. The defendants counter that local law does not dictate the result in this case— a federal court ordered a specific remedy, and federal law controls the scope and timing of that remedy.

Plaintiffs style their claim as a simple request for the City to follow its own requirements, but adopting their arguments would lead to an absurd result: if plaintiffs are correct, they would win promotions not because they performed well on a test, but, instead, because courts invested the resources necessary to carefully decide a complicated case. Plaintiffs rely on one clause of one section of a civil service regulation to argue that the City has a mandatory duty to use the 2003 test results from 2009 to 2011.  Context, however, matters. Read in light of both the *Ricci* litigation's history, and against the backdrop of the civil service rules' purpose, New Haven's local code left ample room for the City to craft a sensible solution to a novel problem. And that is what the City did – it corrected for a delay by treating exam results as if they had been certified in the past.  Accordingly, for the reasons set forth below, summary judgment shall issue for the defendants.[1]

I.      BACKGROUND

A.  The Civil Service Rules

New Haven's city charter empowers the Civil Service Board to oversee promotions of municipal employees.  Under the charter, "it shall be the duty" of the board to "prescribe rules ascertaining the competency of applicants" for government jobs. NEW HAVEN CITY CHARTER sec. 158.  Once the Board promulgates a rule governing promotions, it must follow it. *Id.* at sec. 160.  The Board must "certify lists of eligible applicants" and "based upon the . . . scores of examinations . . . and the board's determination that its rules have been complied with" elevate candidates with top scores. *Id.* at sec. 158.  In sum, the charter issues a simple mandate to the

---

[1] Summary judgment is appropriate when the record demonstrates that there is no genuine dispute regarding any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment). Here there are no disputes regarding the facts, only a dispute regarding the legal outcome required by those facts. Thus, the question, quite simply, is which side is entitled to judgment as a matter of law.

agency:  Promote people in the order set by a certified list, and issue rules that detail how that list should be certified.

Decades ago, the Board promulgated a rule that lays out a strict timeline for reviewing and approving promotion exam scores.  Section 1 limits the time between a test administration and certification of a final list of scores.  The Board must publish a list of ranked scores "within 120 working days after the completion of an examination involving 100 or more candidates." *See* Civil Service Rules and Regulations of the City of New Haven ("Local Rules"), Rule IV, Sec. 1.  Section 2 sets the effective date for a list; "an eligible list shall be in effect from the date on which it is promulgated." *Id.*, Rule IV, Sec. 2.  And Section 3 fixes an expiration date for a certified list.  A list "shall be in effect for a period of at least one year but no more than two years from the date of promulgation." *Id.*, Rule IV, Sec. 3.

In most cases, the Board has had little trouble meeting the rule's deadlines. But in 2003, the agency encountered a hurdle—when the Board reviewed a set of test results, it found evidence that the exam might have violated federal law.

B.  The 2003 Firefighters Test

The eleven plaintiffs in this case are firefighters for the City of New Haven.  In late 2003, they took an exam to qualify for promotions within their department.  The City only offers the test every two years, so the stakes were high for applicants. Firefighters "studied for months, at considerable personal and financial cost." *Ricci*, 557 U.S. at 593.  Nervous applicants expected to receive their scores within a few months, after the City had reviewed and certified the exam's results.  Until then, the results remained confidential.

In early 2004, the City reviewed the results of the 2003 tests, ranked test takers in order of performance, and realized that only one person of color had scored high enough to earn

promotion. The City held a series of public meetings to air its concerns about the test, and hear community members' opinions on whether the City should discard the results.  After considering the public's views, the City declined to certify the list of ranked scores because it feared promotions based on the list might discriminate against people of color. The City announced its decision on March 18, 2004. *Ricci*, 557 U.S. at 562-63.

## C.  The First Round of the *Ricci* Litigation

On July 8, 2004, a group of white firefighters sued the City alleging that its failure to certify the list discriminated against white test takers with high scores.  *See Complaint*, *Doc. #1*, *Ricci v. DeStefano*, 554 F. Supp. 2d 142 (D. Conn. 2006) . Plaintiffs' complaint skewered the City of New Haven and its leaders for a wide range of indiscretions. City Hall staff conspired with the Civil Service Board in "surreptitious meetings" to deprive plaintiffs of promotions.  *Id.* at ¶ 40. The Mayor acted out of political animus towards the plaintiffs because he feared alienating leaders who supported his gubernatorial bid.  *Id.* at ¶ 34. All of these individual acts— the meetings, the backroom political deals, and the ultimate decision not to certify—added up to civil rights violation of Title VII, the Fourteenth Amendment, the First Amendment, and section 1985 of the Klu Klux Klan Act.  To redress harm that resulted from these illegal acts, plaintiffs requested monetary damages, including interest, attorneys' fees, and "such further relief as law and equity may afford."  *Id.* at ¶ 63. Although the controversy over the City's refusal to certify the test scores may have sparked the lawsuit, the plaintiffs complained of injuries that resulted from a much broader set of actions, and they requested money to remedy those harms.

The *Ricci* case was litigated for two years in the district court.  Because of conflicts, two judges transferred the case at different times. *Docs. Orders of Transfer*, *#4, 104*. And both sides fought with the vigor typical of responsible and motivated counsel: The defendants moved for

several different protective orders, which the plaintiffs opposed. *Motions for Protective Orders*, Docs. *#14, 30,* 57. The defendants filed two motions to dismiss. Parties filed cross-motions for summary judgment, and each party requested leave to file fifty-five page briefs, well over the normal length. *Motions for Summary Judgment, Docs. #52, 60, Order Granting Request to File Excess Pages, Doc. #50.* In short, the case unfolded as any complicated case does— each step required extensive briefing and careful analysis, all of which took time.

On September 28, 2006, District Judge Janet B. Arterton granted summary judgment in favor of the City. Judge Arterton held that the City had proffered a legitimate non-discriminatory reason for scrapping the test results: The City had a good faith belief that the test had a disparate impact on minority applicants. *Ricci*, 554 F. Supp. 2d at 152-53. She also denied plaintiffs' partial cross-motion for summary judgment. *Id.* at 162.  Because Judge Arterton held that the City had not violated the law, she never identified what particular decision may have caused plaintiffs harm, or what remedy might redress that injury.  The plaintiffs appealed to the Second Circuit.

The appeal hit snags, all of which, again, were characteristic of difficult and politically sensitive litigation. After a year of briefing, a panel heard the case on December 10, 2007.  *Ricci v. DeStefano*, 264 Fed. Appx. 106 (2d Cir. 2008). It issued a summary order two months later. *Id.* Once the plaintiffs petitioned for rehearing en banc, the panel reissued an identical ruling and relabeled it a per curiam decision. *Ricci v. DeStefano*, 530 F.3d 87 (2d Cir. 2008).  Then, in June 2008, almost two years after plaintiffs filed their initial appeal, a divided court denied the petition for rehearing en banc. *Ricci v. DeStefano*, 530 F.3d 88 (2d Cir. 2008). The Supreme Court granted *certiorari* review.

D.   The Supreme Court Decision

5

A year later, in June 2009, the Supreme Court reversed both lower courts. The Court held that New Haven did not have a legitimate non-discriminatory reason for discarding its test results because the City lacked a "strong basis in evidence" to believe the test would subject it to disparate impact liability. *Ricci*, 557 U.S. at 585.  The Court could simply have corrected a legal error and remanded the case for the District Court to sort out how to proceed. Instead, the Court took the unusual step of entering judgment in favor of the plaintiffs. And that decision on liability directed a narrow remedy—that the District Court should order the City to "certify" the 2003 exam results. The Court's recitation of the facts focused on certification alone, and never mentioned other facets of plaintiffs' claims: It walked through each public hearing. It quoted lead plaintiff Frank Ricci's plea to "certify the list"; he "[didn't] even know if [he] had made it" and longed to know if he "passed" because "when your life's on the line, second best may not be good enough." *Id.* at 568. It recited testimony from experts urging the City to approve and publish the list. *Id.* at 569 (Legel testimony), 571 (Christopher Hornick testimony & Vincent Lewis testimony).

The Supreme Court's account built to one limited conclusion: the City was mistaken when it discarded test results, and it should correct its error by certifying the list. "The city was not entitled to disregard the test based solely on the racial disparity in the results," the majority wrote. *Id.* at 593. "If, *after it certifies the test results*, the city faces a disparate impact suit . . . the city would avoid disparate-impact liability based on the strong basis in evidence [test]." *Id.* (emphasis added). The Supreme Court never explicitly commanded the City to certify the list, but its language assumes the City was obligated to take that step. Even though plaintiffs sued to garner promotions rather than for an injunction requiring the City to certify the list, and requested a range of relief including compensatory and punitive damages, the Court seemingly

interpreted plaintiffs' claim as a complaint that the City failed to certify the 2003 civil service

promotion list.

E.   The Second Round of the *Ricci* Litigation

When *Ricci* arrived back on the District Court's docket, [2] Judge Arterton faced a case in a

novel posture. The Supreme Court had dictated a remedy when reversing a ruling on a motion

addressing only liability.  And there was no clear way for Judge Arterton to comply with both the

Supreme Court's mandate and the City's local rules.

To order compliance with Section 1 of the rule governing promotions, the District Court

would have to order the Board to certify a list by March 2004, even though it was already 2009.

But under a narrow reading of section 2, the list would only be valid as of 2009 when the Board

finalized it. To make matters more complicated, under Section 3, the list would have a one-year

shelf life, but it was unclear whether that life would begin on the effective date contemplated in

Section 1 – March 2004—or the day seemingly dictated by Section 2—sometime in 2009. The

City noted this problem, and came up with a solution: In its proposed order, it included a line that

would have certified the list *nunc pro tunc*; the line read "the certified eligible lists shall be

considered to have been effective from March 18, 2004 through March 18, 2006." *See Proposed*

*Order, Doc. #156*,  *Ricci v. DeStefano*, 554 F. Supp. 2d 142 (D. Conn. 2006).

Judge Arterton chose a more minimalist approach. She simply ordered the Board to

"certify the results of the 2003 promotion examinations . . . [and] . . . certify the promotional lists

for each position derived from these examination results." *See Order on Motion for Judgment,*

---

[2] The Supreme Court's remand first went to the Second Circuit, but the Appellate Court merely transferred the case
to the District Court in a short order. "We received the Supreme Court mandate reversing and remanding this case to
the Second Circuit on July 31, 2009, and we now remand to the district court for further proceedings consistent with
the opinion of the Supreme Court." Second Circuit Mandate, Doc. #144,  *Ricci v. DeStefano*, 554 F. Supp. 2d 142
(D. Conn. 2006).

*Doc. #168*, *Ricci v. DeStefano*, 554 F. Supp. 2d 142 (D. Conn. 2006). She then ordered the City

to promote fourteen of the twenty *Ricci* plaintiffs. Her order was silent with respect to the

remaining six.

After Judge Arterton entered her order on November 24, 2009, the Civil Service Board

published the list of ranked scores from the 2003 tests. The City then promoted the fourteen

*Ricci* plaintiffs identified in Judge Arterton's order. It also elevated the ten firefighters who

scored as well or higher than the lowest scoring *Ricci* plaintiff. Once the City had complied with

Judge Arterton's order, the *Ricci* litigation shifted to its next phase – two years of motions and

hearings on damages for each of the individual plaintiffs.  The case finally closed in August of

2011, more than seven years after the plaintiffs originally filed suit.

### F.  The Instant Litigation

In May 2010, plaintiffs in this case filed their complaint. Plaintiffs claim that the plain

language of the Civil Service Rules requires that they be promoted. Under the city charter, the

Board can only promote people using a certified list, and according to the Board's own rules, a

list must remain valid for at least a year after it is approved and published. Plaintiffs argue that,

because the list was only certified in 2009, it had to remain valid for at least a year, if not two,

and the City had a duty to make promotions using that list during that time period. All the

plaintiffs had done well enough on the test to merit promotion, and the City had vacancies.

Plaintiffs assert that the City has no choice but to promote them. They ask this court to issue a

writ of mandamus commanding the City to do just that, or, in the language of mandamus, forcing

the City to comply with its non-discretionary, ministerial duty to follow its own rules.

The City counters that its civil service rules do not apply in this case:  It only had to

promote enough people to comply with Judge Arterton's order, and none of the plaintiffs had

done better than a *Ricci* plaintiff ordered promoted. The City then argues that because Title VII relief must be retrospective—in other words, must put a victim in the place he would have been in but for a violation—any promotions must occur as if it were still 2004, the time that the City mistakenly discarded the promotion exam test results.

II.   <u>DISCUSSION</u>

This case turns on whether the 2003 firefighter test results should be considered certified on the day the City published the results, November 30, 2009, or on the day it should have finalized the list in the first place, March 18, 2004.  Plaintiffs assert that local law requires that the list be certified as of 2009. Defendants counter that federal law controls and dictates the opposite result, certification as of 2004.

Both sides are half right. Defendants had to comply with a federal court order, and to the extent that that order dictated a specific result, a federal pronouncement would constrain the City's ability to make promotions.  Plaintiffs are correct that absent some conflict with a federal law the City still had a duty to comply with local law. But in both scenarios, one in which the *Ricci* order controls, and another in which the City still had to wrestle with local rules, the City had the power to treat the 2003 test results as if they had been certified in 2004.  Given that the City had that power, it did not violate any duty to act otherwise, and a mandamus is inappropriate because "a party seeking a writ of mandamus must establish … that the plaintiff has a clear legal right to the performance of a duty by the defendant [and] that the defendant has no discretion with respect to performance of that duty." *Nielsen v. Kezer*, 232 Conn. 65, 89 (1995).[3]

---

[3] Federal Rule of Civil Procedure 81(b) abolished the use of writs of mandamus in federal district courts. The Rule, however, preserves "relief previously available through [the writ of mandamus]," and parties may seek such relief

A. *Judge Arterton's Order*

Both parties argue that Judge Arterton's order to "certify" the list is best understood by looking to sources outside of her ruling— according to the plaintiffs, by untangling the technicalities of local law, and, according to defendants, by understanding a district court's limited power under Title VII. But if the plaintiffs in this case believed that they might be prejudiced by Judge Arterton's order to "certify" a list, they should have filed a motion to intervene in *Ricci*. And if defendants believed that they could not legally comply with an order to "certify," they should have filed a motion for reconsideration of Judge Arterton's decision or pursued an appeal from her order to the Second Circuit. Presented now with an order in *Ricci* commanding the City to "certify" a list, I can only interpret what the Supreme Court meant when it ordered the city to "certify" the list.

To be sure, the use of the word "certify" complicates what could have been a straightforward question. And the decision to "certify" the list, rather than promote plaintiffs and award damages, emanated from the Supreme Court. In their complaint, the *Ricci* plaintiffs only demanded monetary relief and their promotion; there is no explicit request for an injunction ordering the City to certify the test results. In her order awarding summary judgment to the City, Judge Arterton understandably never addressed the question of how to craft an appropriate remedy, because she only decided a question of liability.

By using a term of art, the word "certify," the Supreme Court entangled the City in a web of complicated local law, and decided an issue not considered by either lower court in *Ricci*.

---

"by appropriate action or motion under [the federal rules]." Defendants removed this case from state court where writs of mandamus are still available, but, as a formal matter, plaintiffs' claims should now be labeled as a request for injunctive relief.  *See SBA Communications v. Zoning Commission of Brookfield*, 96 F. Supp. 2d 139, 141 (D. Conn. 2000) (noting that some district courts have granted "writs of mandamus" in cases removed from state courts, but counseling that those remedies were technically generic injunctions).  For the sake of brevity, this court will refer to plaintiff's claim as a mandamus action. *Vacheron & Constantin-Le Coultre Watches, Inc. v. Benrus Watch Co.*, 260 F. 2d 637, 639 (2d Cir. 1958) (Hand, L. J.) (noting that "for brevity" federal district courts still issue orders that "we may still speak of as a mandamus").

Putting aside the wisdom of applying the "strong basis in evidence" standard,[4] the Supreme Court further constrained the District Court when it instructed the lower court to enter a particular remedy, and did so in passing: "If, *after it certifies the test results*," the Court wrote, "the city faces a disparate impact suit, then… it would avoid liability based on the strong basis in evidence that, *had it not certified the results*, it would have been subject to disparate-treatment liability." *Ricci*, 557 U.S. at 593.  Faced with the high court's order, Judge Arterton had little choice but to follow the command, even if it posed problems for the City.  "Pursuant to the ruling in *Ricci v. DeStefano*, 129 S. Ct. 2658 (2009), the Court enters the following order . . . . The New Haven Civil Service Board shall certify the results of the 2003 promotional exam."

   The narrow issue here is thus what the Supreme Court meant when it insisted that the City "certify" a list.  The Court could have intended to evoke a technical process prescribed in local rules, or it could have used the word as proxy for something else, like a means to redress a concrete harm. Read in light of the manner in which the Court framed certification, it must have used the word in the latter sense. In the sentence preceding its reference to certification, the Court emphasized that "the injury arises from the high, and justified, expectations of the candidates who had participated in the testing process on the terms the City had established for the promotional process."  *Ricci*, 557 U.S. at 593. To redress that injury, the Court indicated, the City should honor applicants' reasonable expectations. Every candidate who took the 2003 exam believed the promotion process would proceed in one way: Applicants would take the test and the City would certify the test within four months of the test date. For two years, that is, only

---

[4] The Supreme Court could have believed either of two different things: First, that it was announcing a new standard for proving an affirmative defense in a case in which an employer fears disparate impact liability. Second, that Judge Arterton had applied the wrong standard when she evaluated the city's fear of suit. In either case, a lower court had never applied the strong basis in evidence standard, and parties had never amassed a record with that standard in mind.  It is no wonder, then, that the Supreme Court found little evidence to support a legal standard that was never in play during the underlying litigation.

until 2006, the City would fill vacancies as they arose based on those certified scores. No one anticipated that six years of protracted litigation would delay promotions. In short, the Supreme Court betrayed no concern for a procedural error that could be corrected by forcing the City to hew to the technical requirements of certification, but, rather, the Court focused on righting a substantive wrong, promoting people to jobs they had earned.

This interpretation of the Supreme Court's order also comports with the way that Judge Arterton used the word "certify" in her November 2009 decision. That much is evident just by doing the math that led Judge Arterton to order limited promotions. In 2009, the New Haven Fire Department had eleven vacancies for the rank of lieutenant and eleven vacancies for the rank of captain, for a total of 22 vacancies. *See Appendix Table 2*.  Had Judge Arterton intended her order to require that the list be certified as of 2009, she would have promoted every *Ricci* plaintiff who scored high enough to fill those twenty-two vacancies. But Judge Arterton only promoted fourteen of the eighteen *Ricci* plaintiffs, cutting off the list at the sixth highest scoring captain, and the tenth highest scoring lieutenant.  *Appendix Table 1*. That left off two *Ricci* plaintiffs with scores high enough to merit promotions if there were twenty vacancies—Edward Riordan achieved the ninth highest score on the captain's exam, and John Vendetto scored nearly as well coming at tenth on the list. *Id.* If Judge Arterton had intended for her order to "certify" the list to force the City to use the results prospectively, she would have ordered the City to promote those two individuals.

Plaintiffs claim that the Supreme Court and the District Court meant for the word "certify" to trigger an intricate local process, rather than using the word in its more general sense of "finalize" or "publish." But to interpret both courts' words so strictly would unfairly benefit plaintiffs. Complex civil litigation takes time; the adversarial process requires courts to invest a

12

great deal of energy, thought, and patience into guiding a case to a just resolution. The Supreme Court and District Court meant to do just that, and to rule otherwise would allow parties to benefit not from a judgment in their favor, but, instead, from courts' diligent efforts to fairly decide another case.

B. *Federal and Local Law*

Even if plaintiffs are correct, and Judge Arterton's order was neutral regarding the timing of certification, neither federal nor local law required the City to certify the list as of either 2004 or 2009. In the absence of a binding rule, the City was free to do what agencies and other government bodies do every day– interpret existing regulations in a reasonable manner that fairly resolves the idiosyncratic problem before them.

1. Federal Law

Defendants argue that federal law requires that the list be deemed certified in 2004. Their argument has two basic steps: First, Title VII constrained the *Ricci* Court's power, such that Judge Arterton could only award retrospective relief. Second, because federal law preempts state law, and because Title VII controlled Judge Arterton's order, the local Civil Service rules simply did not apply to the City's certification of the 2003 test results.

Title VII grants district courts broad discretion to formulate remedies. Under 42 U.S.C. § 2000e-5(g), the court may order "such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without backpay . . . or any other equitable relief as the court deems appropriate." Congress gave trial courts this expansive power for two reasons: First, because each case of discrimination will take its own peculiar form, district courts must tailor remedies to fit the idiosyncrasies of each case. In the words of the Supreme Court, "Congress took care to arm the courts with full equitable powers . .

. [so that] 'courts will be alert to adjust their remedies . . . [and] grant the necessary relief.'"

*Albermarle v. Moody*, 422 U.S. 405, 418 (1975) (quoting *Bell v. Hood*, 327 U.S. 678 (1946)).

Second, Congress intended for Title VII to deter future discrimination. Congress had no way of

knowing what might stop a particular employer from engaging in unlawful employment

practices. So, rather than dictate a formula for constructing remedies, Congress delegated

authority to district courts to fashion the right remedy to force each particular offender into

compliance with the law. *Id.* at 418.

Of course, as with any discretionary power, a district court cannot remedy a problem in

an irrational or arbitrary manner. In *Albermarle v. Moody*, the Supreme Court held that a district

court had to award backpay to a worker denied promotions because of his race.  Even though the

district court found the employer liable for an unlawful practice, the court only awarded

injunctive relief. The Supreme Court reversed. The majority acknowledged that Title VII awards

no "automatic or mandatory remedy," and that a district court sitting in equity has wide latitude

to choose the appropriate relief in a given case. *Id.* at 416. But, the Court noted, "discretionary

choices are not left to a court's 'inclination but to its judgment, and its judgment is to be guided

by sound legal principles.'" *Id.* In the context of Title VII, district courts must construct remedies

in a manner that "make persons whole for injuries suffered on account of unlawful employment

discrimination." *Id.* at 418. This includes a presumption that backpay is necessary to "make

whole" a victim deprived of income. *Id.* Thus, *Albermarle* stands as a familiar reminder to

districts courts: trial courts have the duty and authority to engage the particular facts of a case,

but they should do so in manner that hews to the general purpose of the law in question.

Defendants rely on *Albermarle* and its progeny to argue that the *Ricci* Court only had the

power to award retrospective relief: The *Ricci* plaintiffs were unlawfully denied the right to have

their test results certified and used for promotions. According to defendants, the only way for the district court to redress that harm was to enter an order certifying the lists *nunc pro tunc*; in other words, Title VII required that the Court turn back the clock to 2004.

The City's position over-reads *Albemarle*. Nothing in Title VII required Judge Arterton to enter an order commanding the City to certify a list retroactively. Certainly, as the City points out, that may have been a prudent approach: According to the Supreme Court, New Haven should have certified the 2003 exam results on March 30, 2004. The decision to do otherwise caused the *Ricci* plaintiffs harm, and the easiest way to remedy the harm would be to rewind events to 2004. But just because that would have been a logical and sufficient response does not mean it was a necessary one. Whether or not the list was technically certified in 2004 or 2009, the City could have put the *Ricci* plaintiffs in the same material position they would have been absent a violation: The City could have put the plaintiffs first in line for promotions, awarded plaintiffs backpay, credited plaintiffs for their lost years of service when it calculated retirement benefits, and so forth. In sum, Judge Arterton could have rationally and legally ordered the City to certify the list as of 2009, and still compensated the *Ricci* plaintiffs for the injury they suffered in 2004.

Indeed, the difference between certification of the promotions list and backpay is instructive. In *Albermarle*, the district court declined to award back pay because of a procedural misstep on plaintiffs' part. The Supreme Court reversed that decision because it concluded that only a monetary award could redress plaintiff's loss of income. *Albermarle*, 422 U.S. at 418. The Court made broad pronouncements about the purpose of Title VII in *dicta*, but its holding rested on a practical calculus: Congress included the word "back pay" in Title VII in order to invoke a long tradition of awarding monetary damages to workers deprived of pay. *Id.* at 419 n.11. There

was no other way to compensate the *Albermarle* plaintiff for the cost of losing a wage. The

failure to certify exam scores is qualitatively different: It is not a direct injury, but a procedural

misstep that led to a concrete harm— loss of promotions. To be made whole, plaintiffs deserved

promotions, not their names on a list, and certainly not their names on a list as if it had been

published years before.[5]

Even if Title VII had required retrospective relief, defendants have also exaggerated Title

VII's preemptive effect on local law. Defendants argue that, because "certification of the exams

[was] the very procedure contemplated by the Supreme Court,  . . . what certification means is

within the sole discretion of the federal court." *Memo of Law in Support of Summary Judgment

at 7*. In essence, defendants argue that the federal court issued an edict, so state law cannot

control.

But no court has ever held that Title VII occupies the remedial field. The statute contains

an express preemption provision: The statute preempts any state law that "purports to require or

permit the doing of any act which could be an unlawful employment practice." 42 U.S.C. §

---

[5] Defendants also cite two decisions in which appeals courts vacated district courts' remedial orders because the
orders unfairly affected third parties. In *EEOC v. Local 14*, the Second Circuit vacated an injunction that affected
contractors that worked with a union that had discriminated against non-white engineers. 553 F. 2d 251 (2d Cir.
1977). The Court reversed the lower court because there had never been a damages hearing in which the contractors
could voice their views. *Id*. at 257.  The First Circuit vacated a similar order for similar reasons. In *Brown v. Boston
University*, the appeals court vacated an order that barred a university from discriminating against all employees
because the injunction reached faculty who were not parties to the underlying litigation. 891 F.2d 337 (1st Cir.
1989).

Judge Arterton's order to certify test results was not a broad remedy like the injunctions in *Local 14* and
*Brown*. In the two cited cases, the district courts erred by imposing broad remedies that had a direct effect on third
parties—in *Local 14*, the court forced contractors to pay for a union's wrongs, and in *Brown*, the court benefited
thousands of employees who had never complained of any harm. Here, however, Judge Arterton's order had no
direct effect on anyone but the parties in *Ricci*. Like any injunction that changes the status quo in a workplace,
certification had ripple effects within the fire department. Every time someone is promoted, the relative position of
other staff members changes, sometimes for better, sometimes for worse. But that is not the same as the direct
benefit or detriment exacted by an overly expansive order. If anything, Judge Arterton's order was too targeted.
Rather than provide holistic relief, the order addressed a single procedural problem with the promotion process (that
initial narrow approach was, of course, only necessary because of the Supreme Court's unusual instructions).

2000e-7. In *Ricci*, the Supreme Court held that the City could not refuse to certify a list out of concern for its effect on minority applicants.  Title VII would therefore preempt any state law that prevented the City from certifying the list in a race neutral manner. Title VII, however, does not preempt a state law that imposed requirements on certification that are unrelated to race. The statute only imposes certain restrictions on the way employers hire and promote workers, but employers still use their own criteria to determine whom to hire, fire, and promote. The City's Civil Service Rules are just a means to test job fitness. Certification ensures fair promotions, and unless those rules force the City to do something illegal, local law and federal law can coexist.

    2.  <u>Local Law</u>

Plaintiffs argue for a literal reading of the New Haven charter and local regulations. Their argument also has two steps: First, the City's charter directs the Civil Service Board to certify test results and then use those certified results as the basis for promotions. It also instructs the Board to pass rules that detail how certification should work. Second, under the rules issued by the Board, an approved list has a specific effective date and a maximum expiration date. Rule IV, section 2 states that "[a]n eligible list shall be in effect from the date on which it is promulgated," and section 3 states that "eligible lists shall be in effect for at least one year but not more than two years from the date of promulgation." According to plaintiffs, the City simply did not comply with its duty to follow the rules.

But, following remand in the *Ricci* case, the rules conflicted with themselves. Section 1 of the Civil Service Rules limits the time the City has to certify test results; it must act "within 120 working days after the completion of an examination involving 100 or more candidates."  It is undisputed that the 2003 test occurred in 2003, and that more than 100 firefighters took the test. According to Section 1, the City only had until March 18, 2004 to certify the list. It is also

undisputed that City only finalized the list in November of 2009, and that under Section 3 a list is deemed "certified" on the date it is officially published or "promulgated."  Thus, the Rules presented the City with a textual knot— according to the regulation's literal letter, the City had to certify the list by March of 2004, but it also had to consider the list certified as of November 2009.  Plaintiffs attempt to unravel that knot by pulling on only one thread – the words "shall be in effect" of Section 3.

Had plaintiffs taken a broader view, one that focused on all three sections of Rule IV and acknowledged the Rule's purpose, they might have seen that their narrow reading makes little sense. The three provisions of Rule IV work toward one goal—to limit the amount of time between tests and promotions. The City has less than four months to evaluate results. It then must certify the test on a specific day, an event that triggers a countdown to the results' expiration date.  Once that clock starts ticking, the City may only rely on results for a maximum of two years, and, indeed, the Rule suggests that in some circumstances the City should toss results after only one year. Thus, read together the Rule's subsections impose the same constraint —each provision in some way ensures that the City use results for a short, prescribed time, and not for a moment longer.  The Civil Service Rules drafters cannot have intended the "shall be in effect" language of Section 3 to command that 2003 test results control promotions for the following eight years. Much more plausible is that the Rule sketches a timeline for a test's acceptable use, a timeline that has a maximum duration of 28 months.

Such a reading comports with the Civil Service Rules' accepted purpose. Connecticut courts have long held that civil service exams have a limited shelf life.  In *State ex. rel. Chernesky v. Civil Service Commission*, the Connecticut Supreme Court explained that "[o]ne who could demonstrate his ability [at a specific time] to perform the duties of an office higher

than that he then held, might, for a wide variety of reasons, be incompetent to do so a few years later." 141 Conn. 465, 469-70 (1954). For this reason, the Court continued, "[a] limitation on the life of an eligibility list represents a well-established policy of the merit system." *Id.* Heeding *Chernesky*'s advice, Connecticut courts have struck down promotion systems that extend an eligibility list's reach beyond the two-year limit in Section 3. *See, e.g., New Haven Fireboard Society v. Board of Fire Commissioners*, 32 Conn. App. 585 (1993) (holding that a city agency could not interpret Rule IV to allow for a list to serve as the basis for promotions more than two years after promulgation of the list). Plaintiffs in this case seek exactly what *Chernesky* forbade – reliance on a Civil Service exam years after the test measured a candidate's abilities.

To interpret Rule IV to suggest a different path would lead this court to an absurd end. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 533 (2004) (noting that courts should not interpret text in a manner that leads to absurd results) (Kennedy, J.), *National Cable & Telecommuncations Ass'n Inc. v. Gulf Power*, 534 U.S. 327, 341-42 (2002) (same) (Kennedy, J.); *see also* Akhil Amar, AMERICA'S UNWRITTEN CONSTITUTION: THE PRECEDENTS AND PRINCIPLES WE LIVE BY 7-8 (2012) (discussing the "absurdity doctrine's" deep roots in American and English common law, in particular its use as an equitable backstop against an interpretation that directly contradicts a legislature's intent).  The plaintiffs in this case tested for promotions almost ten years ago. Much changes in a decade. Candidates once fit may have lost skills, strength, and savvy. Indeed, the plaintiffs in this case might never have been found fit for promotion; they would only win promotion because of the delay caused by the *Ricci* litigation. If plaintiffs prevail, the City would be required to promote between twelve and twenty people who would have remained line officers absent a legal error by the City in 2004. In March 2006, there were eight captain vacancies and eight lieutenant vacancies. By 2010, those numbers had grown to

fifteen and thirteen, and a year later in 2011, they had ballooned to twenty-one and fifteen. *See Appendix Table 2*.  To adopt the plaintiffs' cramped reading of Rule IV, then, would lead to a nonsensical result: A rule meant to ensure fitness would require the City to fill the Fire Department's upper ranks with unproven candidates.

Even if Rule IV were ambiguous, the City adopted a reasonable interpretation of its own regulations when it retroactively certified the 2004 test results. The court order to certify the 2003 list forced the City to decipher how Rule IV could apply years after a test administration. The New Haven Civil Service Board unraveled this conundrum with a novel tool, retroactive certification. It approved the test results in 2009 but treated the results as if they had been certified back in 2004. This is evident from whom the City chose to promote—the Board elevated the *Ricci* plaintiffs named in Judge Arterton's order, and also advanced ten officers who would have merited promotion had the City certified the list in 2004 and used it to make promotions until 2006. *See Appendix*, Table 2. The City justified its decision by interpreting Civil Service Rule IV to allow for an adjusted date of certification when some outside force, like litigation, delayed review of the test results.  Nothing prevented the Board from adopting that interpretation of its own rules.

Agencies need the flexibility to solve problems for which there are no precedents.  Rules can address predictable challenges like the timing of a public meeting, the proper metric for evaluating results, or the relevant qualifications for a job.  But a set of rules will inevitably have gaps through which an unusual case can fall. Agencies can stretch their rules to cover that unregulated space, as long as the agency's construction of its regulation is reasonable and within the parameters set by its enabling statute. *Cf. Griffin Hospital v. Comm'n on Hosp. & Health Care*, 200 Conn. 489, 497 (1986) (explaining that courts should accord "great deference" to "an

agency's own interpretation of its own duly adopted regulations");[6] *see also Auer v. Robbins*, 519 U.S. 452, 461 (1996) (holding that agency's interpretation of its own regulations was "controlling unless plainly erroneous or inconsistent with the regulation").

The City's approach was a reasonable interpretation of Rule IV:  It discerned that Section 2's command that a list "shall be in effect" from "the date of promulgation" could be reconciled with the time limits in Sections 1 and 3 if the list were treated as if it had been finalized back in 2004.  In essence, the City inserted the word "lawful" as an implied term between "of" and "promulgation," interpreting the phrase as "the date of [lawful] promulgation."

In adopting this approach, the City and the Civil Service Board acted within the powers enunciated in the city charter. The charter prescribes strict limits on the procedures the City uses to promote civil servants:  It demands that the City only promote people off of a certified list; it states that the City must "certify lists of eligible candidates for positions in *all* departments." NEW HAVEN CITY CHARTER sec. 158 (emphasis added). The City must do so by following its

---

[6] Connecticut courts sometimes scrutinize an agency's interpretation of a statute with a more exacting eye than federal courts. Although federal courts tend to defer to agencies' reasonable constructions of an ambiguous statute, *Chevron U.S.A. v. Nat'l Res. Defense Council*, 467 U.S. 837 (1984), Connecticut courts decline to grant any "special deference" to a state agency's interpretation of a statute if it has not yet "been subject to judicial scrutiny." *Dep't of Public Safety v. Freedom of Information Comm'n*, 298 Conn. 703, 716 (2010). This closer review, however, is limited to instances in which an agency interprets legislative commands. Here, an agency has construed its own regulations, and Connecticut courts continue to accord deference to an agency's attempts to clarify its own rules. *Griffin Hospital*, 200 Conn. at 497 ("This principle [of great deference] applies with even greater force to an agency's interpretations of its own rules.").

One wrinkle in this case is that it is unclear what body or official interpreted local rules to allow for retroactive certification, when that position was made public, and through what means. In the federal system, *Auer* deference normally only applies to interpretations issued before litigation in some official publication like a guideline or policy statement, and Connecticut courts would likely apply similar criteria to state rules. *See, e.g.*, *Christopher v. Smithkline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012) (reasoning that agency interpretation did not "reflect the agency's fair and considered judgment on the matter in question" because agency only advanced its reading during litigation and regulated party did not have notice of agency's position prior to suit); *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 213 (1998) (rejecting agency's interpretation contained in brief because it was a "convenient litigating position"). The City's summary judgment papers do not explain or document the process it underwent before it certified the list in 2009. What is clear, however, is that the Civil Service Board and the officials who oversee promotions within the Fire Department believed that local rules allowed for this result long before Luschenat and his colleagues filed the complaint in this case, and the City's position was readily apparent to anybody following the unfolding events in 2009: City lawyers asked Judge Arterton to deem the list certified *nunc pro tunc*, and after she issued her order, the City certified a list and then promoted people off that list as if it had been finalized in the past. Thus, this case does not raise notice concerns nor is there reason to doubt the sincerity of the City's position.

own rules because "[w]henever said board shall have adopted rules relative to the appointment or promotion of any class of such officials no appointments or promotions within such class shall be made except for . . . upon the list of those eligible for such position or promotion under the rules." *Id*. at sec. 160. And the City cannot change a rule midstream since "[w]henever said board shall have adopted any rules under any of the different provisions of this section, said rules shall not be changed except after public hearing." *Id.* at sec. 159. The charter is silent, however, on the City's power to reinterpret its rules when a simple application of standard procedures is impossible. Absent some explicit prohibition, the City retains the power to read its rules in a sensible manner, one that smooths technical wrinkles and ensures the swift resolution of a discrete problem. That is why federal courts draw a sharp distinction between a legislative rule that changes a substantive standard, and an interpretive rule that merely clarifies how a standard applies to a particular case. *See, e.g.*, *American Mining Congress v. Mine Safety & Health Administration*, 995 F.2d 1106 (D.C. Cir. 1993). And that is what municipal administrators did here. Rather than allow twenty people to garner a benefit they would have otherwise never received, the City interpreted its rules to allow for a more sensible result— the limited promotion of only those officers who would have been promoted absent a prior mistake.

Technical arguments, ones that trace the formal contour of a rule, appeal to courts' commitment to precision and clarity. But technical arguments can also draw courts into sanctioning an absurd or impractical result. Such is the case here: The letter of a local rule imposes standardized constraints that do not fit this unusual case, and if taken too literally, would result in a windfall for the plaintiffs. That is surely not what the Supreme Court intended when it instructed the City to certify its 2003 test results, and not what Judge Arterton meant to impose when she ordered the City to certify the list. Federal law does not require that the City certify the

list either prospectively or retrospectively. And, most importantly, local law, when understood in the appropriate context, imposes no mandatory duty on the City to witlessly apply a rule. Instead, the Rule allows the City to retroactively certify a list when necessary, and to adopt a rational and efficient resolution to an unusual and perplexing problem.

III.   <u>CONCLUSION</u>

The City did not fail to perform a ministerial duty; it complied with its reasonable interpretation of its own rules. Accordingly, mandamus (an injunction) is not available in this case. Judgment will enter in favor of the defendants.

It is so ordered.

Dated at Bridgeport, Connecticut, this 6th  day of February 2013.

<u>/s/ Stefan R. Underhill</u>

Stefan R. Underhill
United States District Judge

APPENDIX

1.  Tables of Test Results

* = ordered promoted by Judge Arterton's *Ricci* decision
# = others promoted by New Haven after Judge Arterton's *Ricci* order
‡ = *Luschenat* plaintiff
+ = unpromoted *Ricci* plaintiffs

*Captain Results*

| RANK | NAME | SCORE |
|---|---|---|
| 1 | Matthew Macarelli* | 92.81 |
| 2 | Brian Jooss* | 89.00 |
| 3 | Timothy Scanlon* | 85.15 |
| 4 | John Ryan # | 81.03 |
| 5 | William Gambardella* | 80.88 |
| 6 | Gary Carbone* | 79.68 |
| 6 | Benjamin Vargas* | 79.68 |
| 7 | Luis Rivera | 78.40 |
| 8 | Karl Luschenat ‡ | 78.12 |
| 9 | Edward Riordan + | 76.91 |
| 10 | John Vendetto + | 76.45 |
| 11 | James Schwartz ‡ | 76.40 |
| 12 | Felipe Cordero ‡ | 76.02 |
| 13 | James Blakeslee | 75.72 |
| 14 | Eugene Stabile ‡ | 75.07 |
| 15 | Jeffrey Baskin | 74.95 |
| 16 | Melissa Allen | 73.73 |
| 17 | Richard Blakeslee | 73.60 |
| 18 | Kenyetta Harris | 71.83 |
| 19 | Thomas Michaels + | 71.35 |
| 20 | Kevin Owens | 71.27 |
| 21 | Herschel Wadley | 70.38 |

*Lieutenant Results*

| RANK | NAME | SCORE |
|------|------|-------|
| 1 | Gregory Boivin * | 90.10 |
| 2 | Timothy Kieley # | 87.2 |
| 3 | Sean Reynolds # | 85.6 |
| 4 | Gary Cole # | 84.4 |
| 5 | Bruce Galaski # | 84.2 |
| 6 | Frank Ricci * | 84.1 |
| 7 | Michael Blatchley * | 82.73 |
| 7 | Michael Christoforo * | 82.73 |
| 8 | Steven Durand * | 82.5 |
| 9 | Mark Vendetto * | 81.93 |
| 10 | Ryan DiVito * | 79.43 |
| 11 | Thayer Baldwin # | 78.1 |
| 12 | Christopher Parker * | 76.9 |
| 13 | Tyrone Ewing | 76.6 |
| 14 | James Watkins | 76.1 |
| 15 | Terrence Rountree | 75.97 |
| 16 | James Kearney ǂ | 75.87 |
| 17 | Brian Bonapace | 75.13 |
| 18 | Thomas Fitzgerald ǂ | 74.6 |
| 19 | Dawud Amin ǂ | 74.33 |
| 20 | Sean Patton + | 73.33 |
| 21 | Octavius Dawson ǂ | 72.73 |
| 22 | Eric George ǂ | 72.27 |
| 23 | Michael Briscoe | 72.23 |
| 24 | Michael Farrell | 72.2 |
| 25 | Kenneth Goodale ǂ | 71.93 |
| 26 | Steven Ortiz ǂ | 71.2 |
| 27 | Ralph Colon | 70.87 |
| 28 | Robert Ciociola | 70.73 |
| 29 | Carl Dinello | 70.73 |
| 30 | William Busca | 70.6 |
| 31 | Scott Dillon | 70.30 |
| 32 | Timothy Borer | 70.07 |

2.   Table of Vacancies Available Between 2004 and the Present

| Year | # of New Cptn Vacancies | Total Cptn vacancies | # of New Lt Vacancies | Total Lt Vacancies |
|---|---|---|---|---|
| 2004 | 7 | **7** | 5 | **5** |
| 2005 | 1 | **8** | 3 | **8** |
| **Up to March 2006** | 0 | **8** | 0 | **8** |
| After March 2006 | 0 | **8** | 1 | **9** |
| 2007 | 0 | **8** | 1 | **10** |
| 2008 | 2 | **10** | 0 | **10** |
| **2009** | 1 | **11** | 1 | **11** |
| November of 2010 | 2 | **13** | 0 | **11** |
| December of 2010 | 2 | **15** | 2 | **13** |
| **2011** | 7 | **22** | 2 | **15** |